[No. 401-3.    Division Three.    February 28, 1973.]

THE STATE OF WASHINGTON, *Respondent,* v. DENNIS L. LEHMAN, *Appellant.*

*Francis J. Conklin,* for appellant (appointed counsel for appeal).

*Donald C. Brockett, Prosecuting Attorney,* for respondent.

MUNSON, J.—Defendant appeals his conviction for the crime of robbery.

The Greenacres Branch of the Old National Bank of Washington, Spokane, Washington, was robbed by a lone gunman July 28, 1970. The previous day a man had entered the bank and talked to one of its officers. On the day of the robbery, the same man returned, gave his name as Mr. Harrison, and made an appointment to see the same officer later in the day. He returned about 3 p.m. to keep his appointment. While conversing with the bank officer, he produced a gun, commenced the robbery, and took approximately $30,000.

An anonymous telephone call to the FBI named defendant as possibly being connected with the robbery. Defendant's picture was obtained through the Seattle office of the FBI. The manager of the bank, Mr. Norske, identified this picture as that of the robber who had identified himself as "Harrison".

Subsequent investigation disclosed defendant was living near the town of Selah, Washington, a community some 200

miles southwest of the city of Spokane, near Yakima. Federal agents in Spokane obtained a federal warrant for the arrest of defendant, charging him with the robbery, and a warrant to search his Selah residence. In the early morning hours of July 30, 1970, after traveling from Spokane to Yakima, FBI agents, aided by local law enforcement officers, began a surveillance of defendant's residence, a trailer house. Primarily because of the presence of minor children in the home, the officers decided not to arrest defendant in his residence.

At approximately 6:30 a.m., defendant and his wife left the residence in a 1965 Ford Thunderbird. A short distance from the residence, the car was stopped and the arrest effected peaceably. Defendant and his wife were both immediately removed from the car. Defendant was handcuffed and placed at the rear of the car while a local deputy sheriff and an FBI agent searched the car. The search, while uncovering no fruits or instrumentalities of the crime, did turn up one key under the front seat on the passenger side of the car and another key on the ignition key ring. Subsequent investigation disclosed that one of the keys was to a locker in the Greyhound bus depot in Yakima, and the other to a safety deposit box in an Ellensburg, Washington bank.

It was admitted by the officers that at the time of the search of the car they did not have a search warrant for the car or any information which would lead them to believe the 1965 Thunderbird in which defendant was arrested had been used in the commission of the robbery.

Shortly after the arrest, and after the minor children had been taken from the home, the officers conducted a search of defendant's residence pursuant to the search warrant. A large amount of incriminating evidence was recovered therein. This included over $5,000 in currency found in various locations throughout the residence. Five of the recovered bills of currency had serial numbers matching prerecorded serial numbers of bills taken in the robbery.

Also found in the purse of defendant's wife was a receipt, dated July 28, 1970, for one night's lodging at an Ellensburg motel.

Later, on July 30, 1970 and August 4, 1970, respectively, warrants were issued by the federal court commissioner in Yakima authorizing the search of the locker in the Greyhound bus depot and the Ellensburg bank safety deposit box. These warrants were secured after the keys seized in the search of the car were discovered to fit these receptacles. The search of the bus locker produced a bag containing, among other things, $4,079 in United States currency and $390 in Canadian currency. The search of the safety deposit box recovered in excess of $8,000. The box was registered in the name of "Beverly A. Fellows", Mrs. Lehman's maiden name.

Before considering the errors on appeal, it should be noted that there is sufficient evidence to support the conviction herein. A number of eyewitnesses identified defendant as the robber. Evidence found in defendant's house and in his car linked him to the robbery. Other testimony could be construed to connect a 1956 black and red Dodge car to the crime and to connect defendant with this car. Further evidence found in defendant's wallet at the time of his arrest and by subsequent retrieval of a briefcase from the Yakima River provided additional proof of defendant's involvement in this crime.

Defendant presents three primary assignments of error on appeal: (1) The court erred in refusing to suppress evidence collected during the search of (a) the Ford Thunderbird, (b) the Greyhound bus locker, and (c) the Ellensburg bank safe deposit box; (2) the court erred in refusing to grant a mistrial based upon a prejudicial comment by an FBI agent during the course of his testimony; and (3) the court erred in refusing to require disclosure of the identity of an informant.

The first of the challenged searches is that of the Thunderbird at the time of arrest. The extent and detail of the

search is controverted; but the search was at least sufficiently thorough to uncover a small key under the passenger seat.

Defendant contends this search was impermissible, primarily because it was made without a warrant, under circumstances not justifying the search. One of the officers testified in response to defendant's questions:

> [D]id you have in your knowledge any information that would lead you to believe that the 1965 Thunderbird automobile in which Mr. Lehman was riding had been used in the commission of a bank robbery? A No, not specifically.

■ This is not to say, however, the officers did not have probable cause to search the car. To determine whether probable cause exists we look not only to the testimony, but also to the affidavit upon which the initial search warrant authorizing the search of defendant's residence was issued.[1] In so doing, we then find probable cause to believe (a) defendant had committed the crime, (b) he was residing near a community 200 miles away, and (c) the officers had information to the effect that defendant was at his resi-

---

[1]That affidavit states: "[A] subject described as a large white male approximately 6'4" weighing approximately 240 lbs. wearing blue and white striped coveralls and bill cap and 'mirror-type' dark glasses robbed the Greenacres Branch of the ONB, Spokane, Washington at approximately 3:00 p.m., July 28, 1970. An officer and employee of the aforementioned bank has identified the defendant as being the person who committed the robbery based upon known and established photographs of the defendant from previous arrests in the hands of the FBI. The undersigned has further reason to believe that after commission of the offense the defendant drove to his home which consists of the trailer house at the above address [Lot 12 of High Valley Park Trailer Court, Selah, Washington] where he very likely has concealed the clothing worn at the time of the offense, the revolver which he had in his possession at the time of the offense and the currency stolen from the bank. The knowledge that defendant has returned the aforementioned property to the above address is based upon recent documentary evidence observed by agents of the FBI showing that he regularly and currently is living at the above address. An informant who has supplied other confirmed and reliable information advises that defendant immediately returned to his home at the above location following commission of the robbery."

dence at that time. Upon arrival in the vicinity of defendant's residence, the officers decided not to attempt defendant's arrest in his residence. Shortly after reaching that decision, defendant left his residence by car. It appears to us that the time lapse between deciding to arrest defendant outside his residence and defendant's departure from his residence was too brief in which to obtain a search warrant for that car. This is further complicated by the fact that there were two cars at defendant's residence; a 1966 Ford and the 1965 Thunderbird.

We believe the search of the Thunderbird was valid. There was probable cause to search the car when effecting the arrest for the purpose of obtaining stolen property or other evidence of an incriminating nature. *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971); *Chambers v. Maroney,* 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975 (1970); *State v. Cagle,* 5 Wn. App. 644, 647, 490 P.2d 123 (1971). Furthermore, the arrest of defendant, in his car on a public highway, under the circumstances described herein, satisfies the exigent circumstances requirement for the search of the car without a warrant. *Chambers v. Maroney, supra; Coolidge v. New Hampshire, supra; Carroll v. United States,* 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790 (1925). As stated in *Chambers,* it makes little

> difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. *Given probable cause* to search, either course is reasonable under the Fourth Amendment.

(Italics ours.)

The keys which were seized pursuant to the car search were not immediately recognized by the officers as instrumentalities of the crime; but, they were articles which gave cause for further investigation. It was obvious that one of the keys was a "locker" key. That was sufficient to arouse the suspicion of the officers about the purpose of the other

key. We find no denial of any of defendant's constitutional rights in seizing the keys. It was a reasonable taking.

Defendant also challenges the search of the car as being improper as an inventory search or as a search incident to a lawful arrest. Since we conclude the search was reasonable, and based upon probable cause, we need not determine either of these questions.

Defendant next challenges the content of the affidavit supporting the search warrant for the Greyhound bus depot locker contending that factual inaccuracies therein destroyed the probable cause upon which the warrant was based. That affidavit stated, in part, as grounds for securing the warrant that defendant "at the time of his said arrest had in his immediate possession . . . a locker key bearing numbers . . .". Defendant did not have this key on his person when arrested; the key was found under the front seat on the passenger side of the car he was driving when arrested. We find it permissible to classify a key found in such a position as being within the immediate possession of the driver of the car. *See State v. Potts,* 1 Wn. App. 614, 464 P.2d 742 (1969); *State v. Mathews,* 4 Wn. App. 653, 484 P.2d 942 (1971). Therefore, there is no factual inaccuracy in this affidavit that could be said to destroy the probable cause for issuance of the warrant.

■ ■ Defendant also challenges the affidavit in support of the search warrant for the safety deposit box in the Ellensburg bank, again alleging the existence of factual inaccuracies therein. The affidavit did contain numerous inaccuracies. Material factual inaccuracies can destroy probable cause. *Rugendorf v. United States,* 376 U.S. 528, 11 L. Ed. 2d 887, 84 S. Ct. 825 (1964). However, as this court stated in *State v. Hink,* 6 Wn. App. 374, 377, 492 P.2d 1053 (1972):

> Neither false affidavits nor material inaccuracies necessary to a determination of probable cause can be sanctioned or condoned. However, this court will not strike down a warrant based upon a good faith affidavit which contains a misstatement that is only of peripheral relevancy. *Rugendorf v. United States,* [*supra*].

Furthermore, it is not necessary that an affidavit contain sufficient information to convince the issuing magistrate beyond a reasonable doubt that there is probable cause but only necessary to establish a prima facie showing of probable cause. *Spinelli v. United States,* 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969); *see also United States v. Ventresca,* 380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741 (1965).

We find sufficient accurate factual statements to have been made in the affidavit here challenged upon which an impartial magistrate could base a finding of probable cause to authorize the issuance of the warrant. The affidavit contained accurate statements to the effect that (1) defendant had been arrested for the instant robbery; (2) Mrs. Lehman was with him at the time of the arrest; and (3) the safety deposit box had been rented, on July 29, 1970, by a woman giving the name of "Beverly A. Fellows", Mrs. Lehman's maiden name. These statements, alone, are sufficient to establish probable cause. This warrant was, therefore, properly obtained.

The second major assignment of error challenges the admission of testimony of an FBI agent relating to the procurement of the photo of defendant from which the initial identification by the bank officer was made. This agent was called to testify by the state and relate his activities with respect to the investigation of the robbery. On cross-examination he was asked the following questions:

Q Now, Mr. Price—by the way, were you involved in any of this picture lineup procedure that Mr. Walton was involved in with Mr. Norske? A No, I was not. Q You handled no part of that? Were you present when this occurred? A Let me just clear that, if you say, "at the picture lineup," "involved in any way": I was to a very small degree to this extent, that I called my Seattle office and furnished the name of Dennis Lehman, and my office advised that they would obtain it or at least try to obtain a photograph of him from McNeill Island Penitentiary. Q Just a moment—The Court: Don't volunteer anything. Mr. Egger: I would ask that the last remark be stricken.

The Court: The last remark of the witness is stricken and the jury will disregard it.

The testimony, until he mentioned the "McNeil Island Penitentiary", was at least responsive to the question as the witness understood it.

■   Nonetheless, the injection by an experienced law enforcement officer of the "McNeil Island Penitentiary" language cannot be condoned. As the court stated in *State v. Taylor*, 60 Wn.2d 32, 37, 371 P.2d 617 (1962), quoting from *Wright v. Oklahoma*, 325 P.2d 1089, 1093 (Okla. Crim. 1958):

> This court has never condoned, but often criticized a witness being intoxicated with eagerness in an all out effort to obtain a conviction. . . . The witness . . . is one with long experience in law enforcement . . . Surely, he was conscious of the rules of evidence that prohibit such actions of a witness.

The relevant question, however, is whether this remark, which the jury was instructed to disregard, when viewed in the totality of all the evidence, did so taint the entire proceedings as to deny the defendant a fair trial? *State v. Johnson*, 60 Wn.2d 21, 371 P.2d 611 (1962). We do not so find. After examining the record, in which the testimony alone consisted of 905 pages, we do not find this remark to have prejudiced the defendant or to have denied him the right to a fair trial. *State v. Martin*, 73 Wn.2d 616, 627, 440 P.2d 429 (1968).

Lastly, defendant assigns as error the refusal by the state to disclose the identity of the informant who called the FBI on the day of the robbery and informed them defendant was involved in the robbery. Defendant raised this issue early in the trial, ostensibly because he believed the informant was an attorney whom defendant allegedly had contacted after the robbery, prior to the time he left Spokane. The request for disclosure was finally limited to one question, that being whether the informant was the attorney defendant had allegedly contacted. The court refused to require the state to answer. Defendant contends that if

in fact the informant was the attorney with whom defendant consulted following the afternoon of the robbery, his telephone call would be a violation of the attorney-client privilege. He also alleges it was impossible for him to appropriately present a legitimate and constitutionally sanctioned defense without knowledge of the informant's identity.

We find no merit in this contention. There is nothing in the record to indicate defendant advised the court of the necessity for revealing the identity of the informant so as to materially aid in his defense other than to state that conclusionary fact. Defendant himself presented to the court his reasons for the need of disclosure of the informant. His essential contention consisted of a theory of conspiracy against him involving the informant, Mrs. Lehman and others. This was tied in with the claim that the informant and Mrs. Lehman were involved in an extramarital relationship. This defense theory could have been presented by calling the parties allegedly involved as witnesses and examining them with respect to this conspiracy claim. All of the parties supposedly involved in the conspiracy were known to defendant. The person whom defendant believed was the informant could have been called to testify with respect to the alleged conspiracy. It was not necessary, therefore, to have the informant's identity revealed in order to present this defense. The identity of the informant was irrelevant with respect to this theory of defense. At no time does defendant enumerate how this disclosure would go to his guilt or innocence, as required to compel such disclosure. *McCray v. Illinois,* 386 U.S. 300, 18 L. Ed. 2d 62, 87 S. Ct. 1056 (1967); *State v. Malone,* 69 Wn.2d 872, 420 P.2d 676 (1966); *State v. Edwards,* 6 Wn. App. 109, 491 P.2d 1322 (1971); *State v. Woods,* 5 Wn. App. 399, 403, 487 P.2d 624 (1971); *Rugendorf v. United States, supra.* This assignment is not well taken.

Judgment affirmed.

GREEN, C.J., and McINTURFF, J., concur.